Melissa A. Fortunato (SBN 319767)
Marion C. Passmore (SBN 228474)
BRAGAR EAGEL & SQUIRE, P.C.
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 568-2124
Facsimile: (212) 214-0506
Email: fortunato@bespc.com
      passmore@bespc.com

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| PRESTON BANKS, Derivatively and On Behalf of ON24, INC., <br><br> Plaintiff, <br><br> v. <br><br> SHARAT SHARAN, STEVEN VATTUONE, IRWIN FEDERMAN, DENISE PERSSON, HOLGER STAUDE, DOMINIQUE TREMPONT, and BARRY ZWARENSTEIN, <br><br> Defendants, <br> -and- <br><br> ON24, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Preston Banks ("Plaintiff"), derivatively on behalf of nominal defendant ON24, Inc. ("ON24" or the "Company"), submits this Verified Stockholder Derivative Complaint against certain current officers and directors of the Company (collectively defined herein as the "Individual Defendants"), and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings submitted by the Company to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by the Company; (iii) a consolidated securities class action lawsuit filed in the United States District Court for the Northern District of California captioned *In re ON24, Inc. Securities Litigation*, Case No. 4:21-cv-08578-YGR (the "Securities Class Action") alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, from February 3, 2021 through September 27, 2021 (the "Relevant Period"); and (iv) other publicly available information, including court filings and media and analyst reports, concerning the Company.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant ON24 against certain current officers and members of the Company's Board of Directors (the "Board"). This derivative action arises from the Individual Defendants' violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") and breaches of their fiduciary duties of loyalty, candor, and good faith and abuse of their control of the Company in connection with their causing, approving, and/or acquiescing in the Company's issuance of false and misleading statements regarding the nature of its "customer" contracts and severely embellishing its "deals" and "partnerships" with customers.

2.     ON24 touts itself as a leading, cloud-based digital experience platform that enables businesses to convert customer engagement into revenue through interactive webinars, virtual events,

and multimedia content experiences.  ON24's customers include business-to-business ("B2B") companies that seek sales and marketing strategies to generate revenue through personalized and interactive digital customer engagement.

3.     ON24 derives revenue and cash flow from sales of subscriptions to its products.  As a subscription-based Company, ON24 must attract new customers and maintain and expand relationships with existing customers, including by "upselling" additional solutions.  To grow, ON24 must continually secure new customers and renew or upsell existing customers.  In the Offering Documents (defined below), ON24 touted its "highly engaged and loyal customer base," including 1,900 customers in more than 40 countries as of September 30, 2020.

4.     With the shift to a more digital world in 2020 due in part to the COVID-19 pandemic, ON24 had purportedly hit a watershed moment and, as a result, was experiencing explosive growth.

5.     On or about February 3, 2021, ON24 conducted an Initial Public Offering (the "IPO" or the "Offering") and raised more than $428 million in gross proceeds for the shares ON24 offered to the public, while the banks that underwrote the Offering collected over $29 million in fees.

6.     Unbeknownst to investors, ON24 signed up new customers for 1-year contracts during the second quarter ended June 30, 2020 ("Q2 2020"), third quarter ended September 30, 2020 ("Q3 2020"), and fourth quarter ended December 31, 2020 ("Q4 2020")—the three quarters preceding the IPO—that planned to either not renew or downsell, a larger-than-typical percentage of which were small- and medium-sized business ("SMB") customers focused on one-time events.

7.     It was not until six months after the IPO that the Individual Defendants finally disclosed materially adverse and previously existing but undisclosed conditions, trends, uncertainties, and risks at the Company that pre-dated the IPO, including high churn, nonrenewal, and downselling amongst customers signed up during the second, third, and fourth quarters of 2020.  For the second quarter ended June 30, 2021 ("Q2 2021"), for example, higher churn was primarily in the first-time renewal cohort, which accounted for over 60% of the total renewal cohort, while SMB customers accounted for 50% of ON24's total "logo churn," *i.e.*, the number of logos or customers lost during that period.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

8. As discussed below, former ON24 employees ("FEs") substantiate the allegations concerning ON24 customers that planned to either not renew or downsell.[1]

9. Then-existing material facts confirmed by the FEs—and other then-existing material facts that were undisclosed during the Relevant Period—about ON24's one-time, event-only, and SMB customers that planned to either not renew or downsell were omitted from the Offering Documents and subsequent SEC filings, rendering those SEC filings materially false and misleading.

10. On August 10, 2021, for example, President, Co-Founder, and Chief Executive Officer ("CEO") Defendant Sharat Sharan ("Sharan") claimed that ON24 "experienced higher-than-expected *churn and downsell from customers we signed up in the second quarter of last year* during the peak of COVID. This *higher churn was primarily in the first-time renewal cohort*, customers who signed up 1-year contracts last year and who were up for renewal."[2]  Defendant Sharan added that "the *lower churn was primarily in the SMB*."

11. Also on August 10, 2021, ON24's Chief Financial Officer ("CFO") Defendant Steven Vattuone ("Vattuone") admitted:

> [T]he share of first-time renewals in Q2 '21 was outsized accounting for over 60% of the cohort.  We saw high churn and downsell within the first-time renewals cohort, which primarily included a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events who rush to find alternative solutions to in-person business, but are normally not our primary target audience.

---

[1]  As mentioned above, the misconduct complained of herein led to the filing of the related Securities Class Action that is currently pending in this Court against ON24 and certain of the Individual Defendants.  On March 18, 2022, plaintiffs in the Securities Class Action filed a Consolidated Complaint for Violations of the Federal Securities Laws (the "Consolidated Securities Complaint" or "CSC").  The Consolidated Securities Complaint includes excerpts from interviews with various former ON24 employees who are knowledgeable about nominal defendant ON24's business, operations, and business practices.  Any references to quotes or information from these individuals in this derivative complaint come from the Consolidated Securities Complaint.

[2]  Unless otherwise noted, all emphasis is added.

12.     When these previously undisclosed adverse facts that existed during the Relevant Period and after were revealed, ON24 common stock plummeted, falling from the IPO price of $50.00 per share to close at $19.68 per share on September 27, 2021.

13.     The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by knowingly engaging in the deceptions alleged herein.

14.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, ON24 has sustained damages as described below.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367 (a) because the state law claims form part of the same case or controversy.  This action is not a collusive action designed to confer jurisdiction on the court of the United States that it would not otherwise have.

16.     The Court has jurisdiction over each Individual Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the nominal defendant because ON24 is authorized to do business in this state, has consented to service in this state, and its principal place of business is within this District.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to ON24 occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

**PARTIES**

2      18.      Plaintiff is a stockholder of ON24, was a stockholder of ON24 at the time of the

3  wrongdoing alleged herein, and has been a stockholder of ON24 continuously since that time.

4      19.      Nominal Defendant ON24 is a Delaware corporation headquartered at 50 Beale Street,

5  8th Floor, San Francisco, California 94105.  ON24 claims it provides a leading, cloud-based digital

6  experience platform that enables businesses to convert customer engagement into revenue through

7  interactive webinars, virtual events, and multimedia content experiences.  ON24's stock is listed under

8  the ticker symbol "ONTF" on the New York Stock Exchange.

9      20.      Defendant Sharan, a co-founder of the Company, is ON24's President and CEO and

10  serves as a member of ON24's Board.  Defendant Sharan sold 147,453 shares of ON24 common

11  stock in the IPO for proceeds of $7.4 million.

12      21.      Defendant Vattuone is ON24's CFO.

13      22.      Defendant Irwin Federman ("Federman") is a director and a member of the Audit

14  Committee.

15      23.      Defendant Denise Persson ("Persson") is a director.

16      24.      Defendant Holger Staude ("Staude") served as a director from April 2016 to April

17  2022, and as a member of the Compensation Committee during the Relevant Period.  At the time of

18  the IPO, Defendant Staude was also an employee of Goldman Sachs & Co. LLC, one of the

19  underwriters of the IPO who is a named defendant in the Securities Class Action.

20      25.      Defendant Dominique Trempont ("Trempont") is a director and a member of the

21  Audit Committee and the Compensation Committee.

22      26.      Defendant Barry Zwarenstein ("Zwarenstein") is a director and a member of the Audit

23  Committee and the Compensation Committee.

24      27.      Defendants Sharan, Vattuone, Federman, Persson, Staude, Trempont, and

25  Zwarenstein are collectively referred to herein as the "Individual Defendants."

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

28.     Each of the Individual Defendants signed the Registration Statement and the 2020 10-K (defined below), each of which was filed with the SEC and contained false and misleading statements as alleged herein.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owed and owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of ON24 were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

32.     Each Individual Defendant, as a director and/or officer, owed and owes to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.     In addition, the Company has also adopted a Code of Business Conduct and Ethics (the "Code").

34.     The Code contains a Policy Statement section which states in pertinent part:

> The New York Stock Exchange rules require that ON24, Inc. (the "a code of conduct for all of its directors, officers and employees.  The Company is committed to being a good corporate citizen.  The Company's policy is to conduct its business affairs honestly and in an ethical manner.  That goal cannot be achieved unless you individually accept your responsibility to promote integrity and demonstrate the highest level of ethical conduct in all of your activities.  Activities that may call into question the Company's reputation or integrity should be avoided.  The Company

understands that not every situation is black and white.  The key to compliance with this Code of Business Conduct and Ethics (this "Code") is exercising good judgment. This means following the spirit of this Code and the law, doing the "right" thing and acting ethically even when the law is not specific.

*       *       *

Managers set an example for other employees and are often responsible for directing the actions of others.  Every manager and supervisor are expected to take necessary actions to ensure compliance with this Code, to provide guidance and assist employees in resolving questions concerning this Code and to permit employees to express any concerns regarding compliance with this Code.  No one has the authority to order another employee to act in a manner that is contrary to this Code.

35.     The Code then goes on to say:

**2. Compliance with Laws and Regulations**

***The Company seeks to comply with both the letter and spirit of the laws and regulations in all countries in which it operates.***

The Company is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates.  You must comply with all applicable laws, rules and regulations in performing your duties for the Company.  Numerous federal, state and local laws and regulations define and establish obligations with which the Company, its employees and agents must comply.  Under certain circumstances, local country law may establish requirements that differ from this Code.  You are expected to comply with all local country laws in conducting the Company's business.  If you violate these laws or regulations in performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, as well as civil actions and penalties, you also subject the Company to the same risks and penalties.  If you violate these laws in performing your duties for the Company, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with the Company.

An explanation of certain of the key laws with which you should be familiar can be found in the employee handbook.  As explained below, you should always consult your manager or the Compliance Officer with any questions about the legality of you or your colleagues' conduct.

**3. Full, Fair, Accurate, Timely and Understandable Disclosure**

It is of paramount importance to the Company that all disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company is full, fair, accurate, timely and understandable.  You must take all steps available to assist the Company in fulfilling

these responsibilities consistent with your role within the Company. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosure.

The Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") are responsible for designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of the Company's disclosure controls and procedures (as such term is defined by applicable SEC rules). The Company's CEO, CFO, and such other Company officers designated from time to time by the Audit Committee of the Board of Directors shall be deemed to be the "Senior Officers" of the Company. Senior Officers shall take all steps necessary or advisable to ensure that all disclosure in reports and documents filed with or submitted to the SEC, and all disclosure in other public communication made by the Company, is full, fair, accurate, timely and understandable.

Senior Officers are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Senior Officers will take all necessary steps to ensure compliance with established accounting procedures, the Company's system of internal controls and generally accepted accounting principles. Senior Officers will ensure that the Company makes and keeps books, records and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company. Senior Officers will also ensure that the Company devises and maintains a system of internal accounting controls sufficient to provide reasonable assurances that:

• transactions are executed in accordance with management's general or specific authorization;

• transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

• access to assets is permitted, and receipts and expenditures are made, only in accordance with management's general or specific authorization; and

• the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, all to permit prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the Company's financial statements.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Any attempt to enter inaccurate or fraudulent information into the Company's accounting system will not be tolerated and will result in disciplinary action, up to and including termination of employment.

**4. Special Ethics Obligations For Employees With Financial Responsibilities**

Each Senior Officer bears a special responsibility for promoting integrity throughout the Company. Furthermore, Senior Officers have a responsibility to foster a culture throughout the Company as a whole that ensures the fair and timely reporting of the Company's results of operation and financial condition and other financial information.

Because of this special role, Senior Officers are bound by the following Senior Officer Code of Ethics, and by accepting this Code each agrees that they will:

   • perform their duties in an honest and ethical manner;

   • handle all actual or apparent conflicts of interest between their personal and professional relationships in an ethical manner;

   • take all necessary actions to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, government agencies and in other public communications;

   • comply with all applicable laws, rules and regulations of federal, state and local governments; and

   • proactively promote and be an example of ethical behavior in the work environment.

36.     Moreover, the Board's Audit and Finance Committee (the "Audit Committee"), which is and had been comprised of defendants Federman, Trempont, and Zwarenstein during the Relevant Period, has a heightened duty under the Audit Committee Charter, which states:

The primary purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities by reviewing and reporting to the Board on the quality and integrity of the financial reports and other financial information, the audits of the Company's financial statements, and the Company's compliance with legal and regulatory requirements.

37.     The Audit Committee Charter then goes on to lay out the responsibilities of the Audit Committee, many of which if carried out could have prevented the wrongdoing alleged herein:

To fulfill its responsibilities and duties, to the extent that it deems necessary or appropriate, and in addition to the items described above, the Committee shall:

1.  Review and discuss with management and the independent auditor the Company's annual audited financial statements and any certification, report, opinion or review rendered by the independent auditor, and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

2.  Review and discuss with management and the independent auditor the Company's quarterly financial statements.

3.  Review and discuss as appropriate with the Company's outside tax advisors the Company's annual tax filing compliance along with the significant assumptions and estimates made in preparing the annual income tax provision and related assessment of any necessary FIN 48 reserves.

4.  Review and discuss with management and the independent auditor the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in the Company's periodic reports.

5.  Review and discuss with management and the independent auditor the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in the Company's periodic reports.

6.  Review and discuss with management press releases regarding the Company's financial results and any other information provided to securities analysts and rating agencies, including any "pro-forma," "non-GAAP" [Generally Accepted Accounting Principles] or adjusted financial information.

7.  Periodically meet separately with management, with internal auditors and with the independent auditor.

8.  Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

9.  At least annually, review with management its assessment of the effectiveness and adequacy of the Company's internal control structure and procedures for financial reporting ("Internal Controls"), review with the independent auditor the attestation to and report on the assessment made by management, and consider whether any changes to the Internal Controls are appropriate in light

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

of management's assessment or the independent auditor's attestation and report.

10. To the extent that it deems appropriate, review with management its evaluation of the Company's procedures and controls designed to assure that information required to be disclosed in the Company's periodic reports is recorded, processed, summarized and reported in such reports within the time periods specified by the SEC for the filing of such reports ("Disclosure Controls"), and consider whether any changes are appropriate in light of management's evaluation of the effectiveness of such Disclosure Controls.

11. Review and discuss with management and the independent auditor any off-balance sheet transactions or structures and their effect on the Company's financial results and operations, as well as the disclosure regarding such transactions and structures in the Company's public filings.

12. Review with management and the independent auditor the effect of regulatory and accounting initiatives on the financial statements.  Review any major issues regarding accounting principles and financial statement presentations, including any significant changes in selection of an application of accounting principles.  Consider and approve, if appropriate, changes to the Company's auditing and accounting principles and practices as suggested by the independent auditor or management.

13. Review any analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including the effects of alternative GAAP methods on the financial statements.

14. Review any special audit steps adopted in light of material control deficiencies.

15. Review any special audit steps adopted in light of material control.  Review the appointment and replacement of the Company's internal audit function. Review and discuss with the internal auditors (i) the charter, purpose, authority and organizational reporting lines of the internal audit function and (ii) the annual audit plan, changes to the audit plan and progress against the audit plan.  Review reports to management and the Board prepared by the internal auditors.  Consult with management and the internal auditor the responsibilities, budget and staffing of the internal audit function and the planning and execution of internal audit activities.

*     *     *

To further fulfill its responsibilities and duties, and in addition to the items described above, the Committee shall:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1. Review with the chief executive officer and chief financial officer of the Company any report on significant deficiencies in the design or operation of the Internal Controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.

2. Review and approve any transactions between the Company and any related parties, after reviewing each such transaction for potential conflicts of interest and other improprieties.

3. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

4. In consultation with the Nominating and Corporate Governance Committee, review and recommend to the Board for adoption any revisions to the Company's Code of Business Conduct and Ethics (the "Code"), which meets the requirements of Item 406 of the SEC's Regulation S-K, and provide for prompt disclosure to the public of any change in, or waiver of, the Code, and adopt procedures for monitoring and enforcing compliance with the Code.

5. As requested by the Board, review and investigate conduct alleged by the Board or management to be in violation of the Code, and adopt as necessary or appropriate, remedial, disciplinary, or other measures with respect to such conduct.

6. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

7. Discuss guidelines and policies to govern the process by which risk assessment and management is undertaken and handled. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

8. Periodically recommend to the Board that either the full Board or its committees oversee and review relevant elements of the Company's risk management policies, oversee and review those elements of the policies assigned to the Committee and monitor the quality of the Company's risk management implementation and execution.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

9. Review with the Company's general counsel and report to the Board on litigation, material government investigations and compliance with applicable legal and regulatory requirements (including policies and practices designed to ensure compliance therewith) and the Code. As requested by the Board, oversee compliance audits or assessments, including evaluating findings and recommendations and management responses and action plans.

10. Prepare the Committee's report required by the rules of the SEC to be included in the Company's annual proxy statement.

11. Develop, in coordination with the Nominating and Corporate Governance Committee, and implement an annual performance evaluation of the Committee.

12. Regularly report to the Board on the Committee's activities, recommendations and conclusions.

13. Review and reassess the adequacy of this Charter at least annually and recommend any proposed changes to the Board for approval. The Committee shall also review on at least an annual basis the scope of responsibilities of the Committee, the Committee's performance of its duties and the Committee's membership requirements. Any proposed changes to this Charter or the scope of the Committee's responsibilities, where indicated, shall be referred to the Board for appropriate action.

38. The Individual Defendants failed to maintain the standards laid out by both the law and the Company itself, resulting in, *inter alia,* the breaches of fiduciary duty and the violations of Sections 10(b) and 21D of the Exchange Act.

## SUBSTANTIVE ALLEGATIONS

**BACKGROUND**

39. ON24's self-professed "mission" is to "transform the way businesses drive revenue and customer engagement through data-rich digital experiences." Founded in 1998 and led by co-founder and CEO Defendant Sharan, ON24 serves B2B company customers by providing a cloud-based digital experience platform for interactive webinars, virtual events, and multimedia content experiences, either live or on-demand. The platform prioritizes two-way engagement between businesses and their customers by turning end-user data into buying signals and behavioral insights that enable businesses to convert customer engagement into revenue.

40.     ON24 offers four "Experience" products:  (1) ON24 Elite, a live, interactive webinar that engages prospective customers in real-time and on-demand; (2) ON24 Virtual Environment, a live, large scale virtual event experience that engages prospective customers in real-time and on-demand; (3) ON24 Engagement Hub, an always-on, multimedia content experience that engages specific prospective customer segments; and (4) ON24 Target, a curated, multimedia content experience that engages specific prospective customer segments to drive a desired action.

41.     ON24's Experience products are "backed" by two enhanced functionality solutions: (1) ON24 Intelligence, an analytics tool that captures first-person data to power the artificial intelligence/machine learning, or AI/ML, engine within ON24's platform; and (2) ON24 Connect, an ecosystem of third-party application integrations.

42.     ON24 derives revenue and cash flow from sales of subscriptions to its products.  As a subscription-based Company, ON24 depends on its ability to attract new customers and maintain and expand relationships with existing customers, including by expanding customer usage by "upselling" additional solutions.  To grow its business, ON24 must continually secure new customers and renew or upsell existing customers.

**ON24'S PRE-IPO GROWTH**

43.     ON24 proudly touted to investors that due to the changes in how businesses were operating more digitally in response to the COVID-19 pandemic, the Company had experienced explosive growth in a new, more digital world.

44.     For example, for the nine months ended September 30, 2020, the Company's revenue increased by 59% as compared to the nine months ended September 30, 2019.

45.     Importantly, ON24 highlighted how "key business metrics" such as the number of customers grew because of purported "[i]ncreasing awareness" of ON24's platform and offerings.  In particular, the Company's customer base steadily increased from 760 customers as of December 31, 2015, to over 1,900 customers as of September 30, 2020 as illustrated in the following graph:



46.     According to ON24, at the time of the IPO, the Company was "focused on continuing to grow the number of customers that use [its] platform[,]" and "[d]espite [its] strong growth to date," ON24's "market [was] still relatively underpenetrated" and there was "significant opportunity to attract many more customers across industries, market segments and regions."

47.     Annual recurring revenue ("ARR")—which is driven by ON24's ability to acquire new subscription customers and to maintain and expand its relationship with existing subscription customers—similarly increased prior to the IPO, growing from $61.2 million as of December 31, 2018, to $138.9 million as of September 30, 2020:

| | December 31, | | September 30, | |
| | 2018 | 2019 | 2019 | 2020 |
| | | (dollars in thousands) | | |
| Customers | 1,241 | 1,401 | 1,342 | 1,918 |
| ARR | $61,249 | $76,852 | $69,997 | $138,872 |
| NRR | 107% | 108% | 106% | 147% |
| $100k Customers | 116 | 144 | 129 | 271 |

48.     As noted in these figures, the Company also reported massive growth in its net retention rate ("NRR")—which reflects ON24's ability to retain and organically grow revenue from existing customers.

49.     Moreover, the Individual Defendants told investors at the time of the IPO that the Company could "achieve significant organic growth by expanding penetration of [its] existing customer base."

50.     Finally, the Individual Defendants told investors that this growth was "partly in response to the COVID-19 pandemic." However, the Individual Defendants omitted to disclose and misrepresented, as further alleged below, that material adverse events, trends, and risks had already developed at the time of the IPO that were putting ON24's growth story to an end.

**ON24 CONDUCTS THE IPO**

51.     On or about February 3, 2021, ON24 conducted its IPO in which it sold 8,560,930 shares of common stock to the public. The IPO, which was priced at $50 per share, generated over $428 million in gross proceeds for ON24, while the IPO's underwriters collected over $29 million in fees.

52.     The IPO was conducted pursuant to, and the sale of ON24 stock was solicited by, several documents that were filed by ON24 and the underwriters with the SEC and disseminated to the investing public, including: (i) a January 8, 2021 registration statement on Form S-1, which, following amendment on January 25, 2021, was declared effective by the SEC on February 2, 2021 (the "Registration Statement"), and (ii) a February 4, 2021 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

53.     The Prospectus states that investors "should rely only on the information contained in this prospectus and any free writing prospectus that we may provide to you in connection with this offering."

54.     The Prospectus also states: "You should not assume that the information contained in this prospectus is accurate as of any date other than its date. Our business, financial condition, results of operations and prospects may have changed since that date."

**THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING OFFERING DOCUMENTS**
*Former ON24 Employees Substantiate the Allegations*
*that the Offering Documents Were Materially False and Misleading*

55.     The Offering Documents misleadingly touted ON24's customer base of over 1,900 as highly engaged and loyal customers as of September 30, 2020.  The Offering Documents also misleadingly claimed that ON24's competitive strengths include a growing base of customers across verticals, and that ON24 intended to leverage its land and expand model to further penetrate customers across these verticals.

56.     The Offering Documents further misleadingly claimed that ON24's ARR reflects its success in acquiring new customers and expanding subscriptions within existing customers.

57.     Moreover, several other statements in the Offering Documents were rendered false and misleading by the omission of undisclosed adverse facts and trends detailed by the former ON24 employees.

58.     In addition, the Offering Documents purported to warn of certain risks—*e.g.*, ON24's growth and ability to retain, expand the usage of, or upsell existing customers, as well as ON24's customers' ability or willingness to purchase or renew subscriptions and COVID-19's effects on customer demand—that, unbeknownst to investors, had already materialized.

59.     As discussed by the former ON24 employees below, ON24 signed up new customers for 1-year contracts during Q2 2020, Q3 2020, and Q4 2020 that planned to either not renew or downsell.  Of those 1-year customers, a larger-than-typical percentage were SMB customers and nonideal customer profile buyers focused on one-time events, and many were one-time use cases that did not integrate ON24's platform into their sales and marketing ecosystem.  These customers planned to either not renew or downsell.

**Former Employee 1**

60.     Former Employee 1 ("FE-1") was an ON24 account executive from January 2019 through September 2021.  FE-1's responsibilities included handling enterprise sales and accounts.

61.     In reference to ON24's business during COVID, FE-1 recalled that the Company knew that a lot of its COVID business was not going to stick including their enterprise business.

62.     FE-1 recalled that ON24 used at least three different systems to track sales, clients, and other information including Salesforce, Forrester, and Gartner.  FE-1 added that Totango was used to track outreach, contacts to clients, and every interaction with clients.  FE-1 advised that Totango showed how long it had been since ON24 last heard from a client.

63.     FE-1 went on to clarify that they were not sure if Gartner was still in use and that Salesforce, Forrester, and Totango were more prevalently used during their tenure.  FE-1 explained that these systems were used to track all meetings with and notes about clients and that all entries made by a customer success manager ("CSM") would be time stamped in the system.

64.     FE-1 recounted how regular updates were sent to C-level employees via email, including Defendant Sharan, and that the same was required for the small business cohort.

65.     FE-1 explained that there were always monthly calls with Defendant Sharan and other C-level employees to discuss clients, including churn risk and potential for expansion.  According to FE-1, all updates went through the directors and above.

66.     FE-1 recounted that weekly meetings were held with supervisors to discuss accounts and that the same thing was required of the small business cohorts.  FE-1 went on to recount that the C-suite employees at ON24 were very involved and that there was a monthly call (held both before the IPO and after) called the "sales and client success meeting."  According to FE-1, those monthly meetings lasted around five hours and everyone from employees of the small business cohort to the executives, including Defendant Sharan, participated.

67.     At these meetings, employees discussed every customer, what was going well and what was not, which clients were likely going to renew, and which were not. According to FE-1, these meetings typically took place during the first or second week of every month.  FE-1 recalled that ON24 skipped the meetings in February and March of 2021 but that they were still required to give account details to C-level employees via email.  FE-1 went on to recall that the monthly meetings started back up in April 2021.

68.     According to FE-1, there were open discussions during meetings and within the Company that the small business cohort did not have good retention rates and that this information

could be seen in Salesforce metrics.  FE-1 added that employees knew when clients would be signing up and going away.

69.     FE-1 explained that every time an employee met with a client, upcoming renewals were discussed, and employees were required to put a note in Salesforce regarding that conversation and update their superior as well.

70.     FE-1 recalled that during the COVID-19 pandemic, ON24 signed anybody and everybody up regardless of if they were considered to be a good customer for the Company.  FE-1 explained that a "good customer" was measured by the Company as (1) having multiple products within their business and (2) fully integrated or having internal customer relationship management or large integration programs like Oracle to handle the data.

71.     FE-1 explained that during the COVID-19 pandemic whoever wanted a contract got one, whereas before the Company wanted customers that would sign on for three of ON24's four of five product offerings.

72.     FE-1 explained that during this period a lot of eventual clients were scrambling to put on conferences or events.  According to FE-1, ON24 was historically interested in customers who would use ON24's platform for meetings with investors, marketing meetings, or large internal meetings, whereas the new COVID-19 related customers were looking to buy maybe five to ten events.

73.     According to FE-1, ON24 had never serviced these types of customers before and that previously they were looking for a greater degree of integration with ON24's products.  When asked if the Company had shifted towards event only clients during the pandemic, FE-1 described the shift towards event only customers as 100% accurate.

74.     In reference to a customer's expectation for renewal, FE-1 recalled that employees were required to track their clients' expectation for renewal in Salesforce in a field labeled "churn" as "low, medium, or high."  FE-1 added that the client success team regularly tracked this field in Salesforce.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

75.     FE-1 explained that the Customer Success team would be present on all client calls and were responsible for updating Totango, which served as their Salesforce equivalent.  FE-1 added that all managers through C-level employees had access to these systems.

76.     According to FE-1, "churn reports" were produced and were discussed at the monthly meetings that were led by Defendant Sharan where he would go through every customer to discuss their status on the churn reports.  FE-1 added that this included all the customers designated as having a high risk of churn and the reports would often be color coded green, yellow, orange, and red to signify likelihood of renewal.  According to FE-1, executives received this report regularly.

**Former Employee 2**

77.     Former Employee 2 or FE-2 worked in sales at ON24 before and after the IPO.

78.     According to FE-2, the churn of customers who signed on during the pandemic was a concern from an account management perspective, but Defendant Sharan was only concerned with revenue.  FE-2 stated that ON24 was signing on everyone and did not care about their potential use cases.

79.     FE-2 explained that ON24 was intended to be used as a marketing tool, not an internal use product, which is what many customers were intending to use it for.  FE-2 stated that ON24 signed on customers that only intended to use the product for a single event as well.  FE-2 recalls these concerns being escalated to management, but not addressed.

80.     According to FE-2, Defendant Sharan not only misled investors, but also employees about the sustainability of ON24's performance.  FE-2 recalled that ON24's success was characterized as a success in itself and not something dependent on the circumstances of the pandemic.  FE-2 explained that this materialized in the form of increased quotas in winter 2020 in the lead up of the IPO.  According to FE-2, the increase in quotas were instituted despite a dramatic decline in demand once lockdown restrictions had begun to relax.

81.     According to FE-2, CSMs would attempt to track the reason behind why customers signed on to determine if they were COVID-19 related customers.  FE-2 explained that when CSMs would go to account executives for clarification, they would be told that the account executives were

being told to just sell and did not have time to qualify customers.  FE-2 explained that ON24 failed to adequately qualify potential customers, including ensuring they had an appropriate use case, from the beginning of the pandemic and throughout 2021.

82.   FE-2 explained that churn being indicated as occurring due to the customer citing ON24 as a COVID-19 related expense was brought up throughout 2020 and that everyone was running into these issues.  According to FE-2, there were instances that you would notice 40-50% churn amongst customers.

83.   FE-2 explained that churn was occurring in several ways: clients were only using ON24 as a COVID-19 solution and electing not to renew at all; customers were not renewing one-time purchases (such as an event manager); or customers were electing to downsell and remove features from their contract.  FE-2 stated that this represented a huge downturn.

84.   FE-2 recalled customers informing them as much as six months in advance, during both 2020 and 2021, that they were not going to renew their contracts.  According to FE-2, staff were given strict instructions not to check churn, referring to a specific field in Totango, for these customers and instead indicate that they had informed ON24 that they would not renew in the notes section.  FE-2 explained that the notes section could not be aggregated in a report to show the true numbers of customers that were going to churn and that the notes field was not tracked.

85.   FE-2 explained that the concerns regarding churn were explained to Defendant Sharan, and towards the end of 2020, there was a revision made to Salesforce to include a field to indicate if a customer had indicated they were engaging ON24 only due to the pandemic as a COVID-19 related expense.  FE-2 recalled staff being told to retroactively go back through accounts to indicate if this was the case to better assess which customers would likely churn.

**Former Employee 3**

86.   Former Employee 3 or FE-3 was an ON24 account executive from March 2019 through April 2021.  FE-3 was responsible for selling ON24 products to small business and mid-market companies.

87.     In reference to ON24 tracking customer information, FE-3 advised that ON24 tracked information through Salesforce including customer purchases, renewals, customers that were active, and customers that were dormant.  When asked whether ON24 would have known that the small business customers who purchased single event or one-year subscriptions would not have renewed their services with ON24, FE-3 replied that they would have.

88.     FE-3 also added that the Company was already aware there was high churn amongst the SMB customers prior to the pandemic, but the pandemic amplified things.  FE-3 explained that the Company had instituted special, lower commission rates that were applied to accounts where the customer was interested in a one-time purchase and was not expected to renew.  According to FE-3, these lower commission rates for one-time purchasers confirmed that the Company knew which customers fell into that category.

89.     According to FE-3, there was a lot of new business in the first few months of the pandemic, which then leveled out shortly before and after the Company's IPO.

90.     When asked whether ON24's ARR computation has a churn element or consideration for existing customers, FE-3 replied that it does not.

**Former Employee 4**

91.     Former Employee 4 or FE-4 worked at ON24 from July 2020 through July 2021 as a sales development representative ("SDR") for the enterprise team and, after the IPO, for the higher education business segment team.

92.     According to FE-4, during the first several months at ON24, business was doing extremely well on the back of the first wave of COVID-19.  FE-4 explained that customers were coming directly to ON24, which was unheard of in sales, and the quotas established by the Company were obtainable during these initial months.

93.     FE-4 recalled customers needing quick solutions during this period and willing to try new services like ON24.

94.     FE-4 stated that during this period account executives were selective in taking meetings with prospective clients and were only interested in meeting with companies identified as

being good potential customers.  FE-4 explained that when detailing "opportunities," it was necessary to provide very detailed notes to the account executives describing the customer's interest.  FE-4 added that notes taken when assessing opportunities were important in the beginning of their tenure, but progressively became less crucial over time as account executives became less selective about who they took meetings with.

95.     FE-4 explained that it got to the point where account executives would say, "Look we just need meetings" to attempt to meet quotas in the face of increased pressure and declining demand.

96.     According to FE-4, enterprise level clients were described as having over $500 million in revenue and over 1,000 employees.  FE-4 recalled that over time ON24 was taking meetings with prospective clients that were simply not an enterprise level opportunity, like the City of Portsmouth or small Christian universities.  FE-4 explained that ON24 did have major clients like Deloitte, but added that outside of these large and established clients, others were not interested in renewing their subscriptions.

97.     According to FE-4, there were customers who only wanted to utilize ON24 for a single event: "quick fix" customers who would still require a one-year subscription.  FE-4 explained that during the summer and early fall 2020, account executives were not interested in speaking with these potential customers.

98.     According to FE-4, things began to change in November 2020 when additional pressure was being placed on account executives and all the employees overall.  FE-4 explained that it was around this time that account executives became willing to take meetings with prospective clients that were interested in using ON24 for "event only" purposes, which did not signify an ideal customer.

99.     FE-4 explained that qualified and unqualified often came down to the way the potential customer planned to use ON24's product and their size.  According to FE-4, qualified customers met certain benchmarks, including revenue and number of employees.  FE-4 stated that qualified customers were not single event customers; they were going to maybe use the product for a few flagship events at the least.

100.     FE-4 explained that unqualified customers were too small with regard to revenue and employee figures or were interested only in using the products for single events.  According to FE-4, they were responsible for determining which prospective clients would advance to a meeting with an account executive.

101.     FE-4 explained that as time went on and demand decreased, they were more likely to pass on unqualified potential customers to an account executive.  FE-4 added that there were times where smaller inbound clients would present themselves, and early on their tenure these would be deemed unqualified, but account executives took meetings with these clients as time went on.

102.     FE-4 described how customers would signal that they were interested in trying ON24 for one event and reluctantly signing on for the one-year subscription to do this.  FE-4 explained that some customers had previously established multi-year deals with Zoom at the time and did not want a long-term commitment to ON24 as well.  FE-4 explained that ON24 did have an integration with Zoom, which was a selling point for clients especially if they only wanted a one-year subscription.  FE-4 described how ON24's Zoom integration made it worth it for these clients, a lot of whom already had Zoom.

103.     FE-4 recalled a lot of notes and memos circulating in November/December or early winter 2020 hinting that the Company would be going public soon and with that came the additional pressure on staff.  FE-4 explained that this pressure continued after the IPO.  FE-4 explained that from their perspective, there was increased pressure to set meetings, while account executives were pressured to sign clients, noting that overall the whole sales team was feeling the pressure.  According to FE-4, the Company expected more from the sales team despite the declining demand, failing to adjust to the changes from the beginning of the pandemic.

**Former Employee 5**

104.     Former Employee 5 or FE-5 was an ON24 sales development representative or SDR from August 2020 through July 2021.  FE-5's responsibilities included handling new business opportunities for mid-market clients, which involved engaging potential customers and setting up meetings with account executives.

105. According to FE-5, demand was very high during the spring, summer, and fall of 2020, so account executives were more selective with what potential customers they took meetings with. FE-5 recalled that during that timeframe, they were exceeding their quotas and even exceeding the more difficult quotas that were implemented thereafter.

106. FE-5 explained that in the beginning there were other companies coming in at a similar price point to ON24, so that did not become an issue until later on. According to FE-5, customers were not using the platform as a replacement for their internal systems, such as Microsoft Teams, and that ON24 was primarily used for marketing purposes through webinars or large company all-hands type of events.

107. FE-5 recalled that, after a lot of early success, things really dropped off and demand declined during November/December 2020. FE-5 explained that market saturation and uncertainty regarding COVID-19 played crucial roles. FE-5 added that new competition was springing up and offering customers the ability to hold one-off events at more reasonable prices, and that ON24 began losing potential clients during initial calls.

108. FE-5 clarified that the drop-off occurred towards the end of 2020 and customer interest continued at the turn of the year. FE-5 explained that ON24 became interested in pursuing a hybrid model to cater to potential clients interested in one-time events, and there were discussions around the possibility of a less strict subscription model. FE-5 agreed that the Company became less particular about its prospective clients as time went on, whereas previously ON24 had only wanted a particular client profile.

109. According to FE-5, prior to employment with the Company, SDRs were focused on large enterprise clients exclusively, and when they joined in August 2020, they were placed on a new team that focused on small and mid-market clients. FE-5 explained that they were instructed to target tech companies in the software as a service space because these customers were likely to have the necessary resources available to them to afford ON24.

110. FE-5 explained that over time the focus on tech companies lessened and any prospective client with a suitable "use case" was considered even if it appeared they would have less

money available for ON24's products.  FE-5 recalled that the instruction was to get clients in the door, regardless of if they satisfied ON24's previously particular prospective customer profile.

111.   FE-5 recalled a shift from inbound to outbound customers, and as 2020 turned to 2021, customers were more interested in "one-off" events.  According to FE-5, these prospective clients would express that they did not have the capital that made sense for a subscription like ON24 or they simply did not have a use for a platform such as ON24 any longer.  FE-5 added that meetings with clients deemed "event only" were taken on more and more as time went on.

112.   According to FE-5, Webex, Zoom, and later Hopin, served as ON24's primary competition.  FE-5 explained that price became the number one objection by customers as time went on.  FE-5 added that customers would speak positively about the platform, but ultimately decline to advance the process due to the one-year commitment and the considerable price compared to competitors.

113.   FE-5 clarified that when initially joining ON24, BrightTALK was essentially ON24's only competitor.  FE-5 explained that BrightTALK had a similar platform at a similar price point and at this time Zoom did not yet offer measurements for engagement metrics.

114.   According to FE-5, the competition shift occurred with the shift towards an increased desire for one-off events.  FE-5 explained that once this occurred, Zoom and Hopin became greater competitors.  FE-5 explained that Hopin's price was based on number of registrants, which was much more attractive for smaller customers, like those that they dealt with.  FE-5 recalled that as a member of Commercial Acquisition I, focus was on prospective customers that had between 25 and 200 employees.

115.   FE-5 recalled Hopin becoming a real issue for ON24 later in 2020, which continued in 2021, as Hopin had become the Company's biggest competition.  According to FE-5, Hopin was a cheaper alternative and customers were drawn to its transparent pricing model.  FE-5 explained that Hopin was available for one-off events and did not have the same contract requirements as ON24.

116.    FE-5 clarified that Hopin's prominence rose in 2021, the same time that things began opening up regarding COVID-19 restrictions, and customers had a greater interest in hosting cheap one-time events.

117.    FE-5 added that it was their understanding that ON24 was exploring altering their product suite to cater to one-off events at a more reasonable price point in late 2020, but was not sure what the status of that possibility ended up being.

118.    According to FE-5, there was a big shift towards hybrid style events, which SDRs began pitching to customers.  FE-5 explained that companies were optimistic about hosting in-person events in 2021 and as a result expressed uncertainty regarding their willingness to commit to a one-year subscription.  FE-5 continued to say that the hybrid model, which would allow for in-person events to be accessible to those who could not attend, was a selling point SDRs used to try to convince prospective clients of ON24's value.

119.    FE-5 recalled a shift around the time of the IPO in February 2021 and noted that the shift to new quotas for sales staff were announced in either March or April.  According to FE- 5, when demand began to drop off the sales staff pushed a lot harder, including more dials and contact increased in late 2020.  FE-5 explained that the new quotas were announced without warning and included an increase of 40-45%.

120.    FE-5 explained that the shift was pretty much centered around the IPO and that it was made clear that ON24 going public and its numbers being public as a result contributed to messaging for sales staff to push.  According to FE-5, the pressure to increase output did not appear to be coming from sales managers, but instead from the top.

121.    According to FE-5, quotas and key performance indicators increased for SDRs and account executives, and it was their understanding that Defendant Sharan had a hand in determining these new benchmarks.  Through conversations with account executives, FE-5 recalled that it was not just the SDR team whose quotas went up, but also account executives.

122.    According to FE-5, Defendant Sharan was tuned in to what was going on with the sales team and was closely monitoring their performance.  FE-5 explained that Defendant Sharan

played a role in the establishment of the new quotas, noting that it was Defendant Sharan and other executives pushing the sales directors who then pushed the account executives to increase numbers. FE-5 added that they were told that Defendant Sharan oversaw everything.

123.   FE-5 explained that in speaking with account executives, it was their understanding that Defendant Sharan was a micro-manager and was hands on with the account executives.  For example, FE-5 explained that when contracts were going through, it would have to go through Defendant Sharan and not just the account executives.  FE-5 explained that it appeared that the executive team as a whole was closely involved with monitoring the performance of the sales team. FE-5 added that you could see that every decision, from every team, came from Defendant Sharan and that Defendant Sharan wanted control of every aspect of every department.

124.   According to FE-5, customers became reluctant over signing one-year deals as time went on, especially in their segment.  FE-5 noted that early on customers were somewhat experimenting to see if a platform like ON24 could add value to their business.  FE-5 explained that, over time, clients realized ON24 did not add enough to their bottom line to justify the cost of the subscription.  FE-5 stated that customers either removed this aspect from their businesses all together or elected to go with a cheaper alternative.

125.   FE-5 recalled conversations with account executives where it became apparent that Defendant Sharan was aware when inbound opportunities slowed down.  FE-5 stated that in response, the SDRs had to go to an outbound approach, which was seen by all the account executives from the meetings booked by the SDR team.  According to FE-5, when account executives saw what was happening regarding demand, they went to the SDRs, who informed them that opportunities were no longer coming in like they were previously.  FE-5 explained that this information made its way up the chain of command.

*The Offering Documents Contained Materially False and*
*Misleading Statements About ON24's Customers and Financial Condition*

126.   The Offering Documents misleadingly touted ON24's customer base of over 1,900 highly engaged and loyal customers as of September 30, 2020.  The Offering Documents stated, in pertinent part:

> **As of September 30, 2020, we had over 1,900 customers** in more than 40 countries, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial and manufacturing companies, in each  case measured by 2019 revenue. No single customer contributed more than 5% of our total revenue for the year ended December 31, 2019 or for the nine months ended September 30, 2020. **We have a highly engaged and loyal customer base that has allowed us to grow our revenue with them over time**, and achieve an NRR of 147% as of September 30, 2020. Our NRR was 107% and 108% as of December 31, 2018 and December 31, 2019, respectively.

127.   The Offering Documents misleadingly claimed that ON24's competitive strengths included a growing base of customers across verticals, including 1,900 customers as of September 30, 2020, and that ON24 intended to leverage its land and expand model to further penetrate customers across these verticals.  Specifically, the Offering Documents stated, in pertinent part:

> Growing base of customers across verticals.  We have a large and diverse set of customers across a broad set of industries.  We have grown our customer base from approximately 760 customers as of December 31, 2015 to over 1,900 customers in more than 40 countries as of September 30, 2020, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial manufacturing companies, in each case measured by 2019 revenue.  We intend to leverage our land and expand model to further penetrate customers across these verticals.

128.   The Offering Documents misleadingly claimed that ON24's ARR reflects its success in acquiring new customers and expanding subscriptions within existing customers.  The Offering Documents stated, in pertinent part:

Key Factors Affecting Our Performance

\*        \*        \*

Annual Recurring Revenue

We believe that ARR is a key metric to measure our business because it is driven by our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription customers.  ARR is calculated as the sum of the annualized value of our subscription contracts as of the measurement date, including existing customers with expired contracts that we expect to be renewed. Our ARR amounts exclude professional services, overages from subscription customers and Legacy revenue.  Our ARR was $61.2 million as of December 31, 2018, $63.6 million as of March 31, 2019, $67.2 million as of June 30, 2019, $70.0 million as of September 30, 2019, $76.9 million as of December 31, 2019, $85.9 million as of March 31, 2020, $114.2 million as of June 30, 2020, and $138.9 million as of September 30, 2020.  ***Our consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic***.

129.    The statements referenced above in ¶¶ 126-28 were each materially false and misleading statements of material fact when made because they failed to disclose and misrepresented the following significant, then-existing material events, trends, and uncertainties that ON24 had already been facing at the time of the IPO:

(a)     ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020 that planned to either not renew or downsell;

(b)     Of these new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020, a larger-than-typical percentage were SMB customers and nonideal customers focused on using ON24's platform for one-time events that did not integrate ON24's platform into their sales and marketing ecosystems because they planned to either not renew or downsell;

(c)     Prior to the IPO, ON24 relaxed the qualification criteria to sign up new customers and shifted to signing up one-time, event-only customers that saw ON24 as a COVID- 19 related expense, regardless of whether the customer had an appropriate use case or would be "sticky" customers generating recurring revenue;

(d)      During both 2020 and 2021, customers informed ON24 employees as much as six months in advance that they were not going to renew their contracts;

(e)      Before the COVID-19 pandemic, ON24 was already aware that there was high churn amongst SMB customers, and the pandemic amplified this high churn;

(f)      Customer churn manifested prior to the IPO in several ways: customers only using ON24 as a COVID-19 solution and electing not to renew; customers such as event managers not renewing one-time purchases; and customers electing to downsell and remove features from their contract;

(g)      Prior to the IPO, the facts that ON24's small business customers were not renewing, were choosing to downsell, and did not have good retention rates were discussed at monthly "sales and client success" meetings, and customer churn was reflected in churn reports and email updates and recorded with Salesforce, Forrester, Gartner, and Totango;

(h)      Customer demand declined during November and December 2020; and

(i)      Given declining demand and the magnitude of new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020 that were either not renewing or were going to downsell, ON24 already faced material customer churn and downselling at the time of the IPO, as well as inevitable weaker revenues, operating losses, and losses per share in 2021.

***The Offering Documents Contained Material
Omissions About ON24's Customers and Financial Condition***

130.      The Offering Documents misleadingly touted ON24's growth strategy, including expanding within existing customers by selling more subscriptions to existing customers and upselling new solutions.  The Offering Documents stated, in pertinent part:

Our Growth Strategy

We intend to drive the growth of our business and the adoption of our solutions by executing the following strategies:

- Expand within existing customers.  We believe we can achieve significant organic growth by expanding penetration of our existing customer base.  ***Our land and expand model drives expansion of new subscriptions within our***

*existing customer base by selling subscriptions to additional parts of existing customers' organizations, expanding into new regional divisions and upselling new solutions*.  In addition, we are developing new applications for our platform, including partner training and employee recruiting and forms of indirect marketing, such as education, enrollment and benefits programs.

131.    The Offering Documents misleadingly touted how the COVID-19 pandemic accelerated ON24's opportunity to help businesses generate revenue as industries modernize.  The Offering Documents stated, in pertinent part:

Businesses today primarily use automated solutions, such as digital advertising and email, for marketing.  While these automated solutions reach large numbers of prospective customers, they have generally failed to deepen customer engagement because they were designed with the simple purpose of pushing marketing messages in one direction—from the business to the prospective customer.

For businesses to succeed, we believe their sales and marketing strategies must evolve from the era of automation to the era of engagement.  Our platform provides an innovative way both to scale digital marketing and deepen prospective customer engagement.  We believe *our opportunity to help businesses convert digital engagement into revenue will continue to grow as industries modernize their sales and marketing processes, which has been accelerated by the COVID-19 pandemic*.

132.    The Offering Documents misleadingly emphasized and touted how ON24 had seen an increase in the proportion of multi-year subscriptions as the number of larger customers increased.  The Offering Documents stated, in pertinent part:

The terms of our subscription agreements are primarily annual and, to a lesser extent, multi-year.  We bill for the full term in advance  or on an annual or monthly basis, depending on the terms of the agreement.  We recognize subscription revenue ratably over the term of the subscription period beginning with the date customers are granted access to our platform.   Our contracts typically require payments in annual installments.  *We have seen an increase in the proportion of multi-year subscriptions as the number of larger customers has increased*.  Customers with multi-year subscription agreements accounted for 21% and 27% of ARR as of December 31, 2018 and September 30, 2020, respectively. See "—Key Business Metrics—Annual Recurring Revenue" for further information regarding how we calculate ARR.

133.    The Offering Documents misleadingly claimed that ON24 continued to focus on customers with 2,000 or more employees and expand usage within those accounts.   The Offering Documents stated, in pertinent part:

> ***We intend to continue to focus on the acquisition of new customers with 2,000 or more employees, or Enterprise customers, and to expand the usage of our platform within these larger accounts***.  We follow a named account coverage approach with aligned account teams, including sales, account management and customer success. After establishing a customer relationship with a business unit of an Enterprise, we seek to expand to new business units, divisions, departments and geographic regions, as well as increase subscriptions to additional products, which we refer to as "attachments," and expand product use cases.

134.    The Offering Documents misleadingly claimed that ON24 could achieve significant growth by retaining, upselling, and increasing sales among existing customers.   The Offering Documents stated, in pertinent part:

> ***We believe we can achieve significant growth by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell***.  Our multi-dimensional land and expand model drives onboarding and allows us to acquire customers via free trials, live demos and continuous engagement with an efficient sales and marketing investment.  As we continue to drive more actionable revenue generating marketing insights, ***we believe that we have a significant opportunity to further increase sales among existing customers across different functional and geographic departments within each respective organization***.  Our ability to pursue this opportunity will require us to scale our sales and marketing organization and otherwise increase our operating expenses, and we may not be successful on the timetable we anticipate, or at all, for any number of reasons, which may cause our results to vary from period to period.

135.    The statements referenced above in ¶¶ 130-34 were each materially false and misleading in context because they omitted the significant, then-existing material events, trends, and uncertainties that ON24 had already been facing at the time of the IPO listed in ¶129.

136.    Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required the Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."   Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R.

§ 229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."  The failure of the Offering Documents to disclose the omitted material facts set forth above in ¶ 129—including the fact that ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020, the three quarters preceding the IPO, that planned to either not renew or downsell—violated Item 303, because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.  This also violated Item 105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in ON24's stock speculative or risky. Indeed, as alleged below in ¶¶ 137-42, the purported Risk Factors that were provided in the Offering Documents were themselves materially false and misleading when made.

***The Offering Documents Failed to Disclose Significant Risks Concerning ON24's Customers That Misrepresented the Speculative Nature of the IPO***

137.    The Offering Documents contained materially misleading risk factors that failed to warn of significant, then-materialized risks posed by ON24's one-time and event only customers that planned to either not renew or downsell, including weak revenues, operating losses, and losses per share.  In other words, the Offering Documents contained materially misleading risk factors that purported to warn of various risks related to, *e.g.*, ON24's growth, ability to retain and upsell existing customers, and the impact of COVID-19 that "may" adversely affect the Company, while failing to disclose that these very "risks" had materialized prior to and at the time of the Offering.

138.    The Offering Documents inaccurately described as potential certain risks associated with ON24's ability to sustain revenue growth and expand sales to existing customers, fluctuation in ON24's performance, potential decline in demand for ON24's solutions, ON24's ability to expand its sales and marketing capabilities and manage its growth, and the impact of the COVID-19 pandemic. The Offering Documents stated, in pertinent part:

Investing in our common stock involves risks, which are discussed more fully under "Risk Factors." You should carefully consider all the information in this prospectus, including under "Risk Factors," before making an investment decision. ***These risks include, but are not limited to, risks relating to***:

- ***Our ability to sustain our recent revenue growth rate in the future, attract new customers and expand sales to existing customers;***

- ***Fluctuation in our performance, our history of net losses and expected increases in our expenses;***

- ***Competition and technological development in our markets and any decline in demand for our solutions or generally in our markets;***

- ***Our ability to expand our sales and marketing capabilities and otherwise manage our growth;***

- ***The impact of the COVID-19 pandemic.***

139.     The Offering Documents inaccurately described as potential certain risks associated with ON24's ability to sustain recent revenue growth, the impact of increasing demand following the onset of the COVID-19 pandemic, and whether new customers will elect not to continue their subscriptions. The Offering Documents stated, in pertinent part:

> ***We may not be able to sustain our recent revenue growth rate in the future.***
>
> For the year ended December 31, 2019, our revenue increased by 8% as compared to the year ended December 31, 2018. We have experienced significant revenue growth during 2020, with our revenue increasing by 59% for the nine months ended September 30, 2020 as compared to the nine months ended September 30, 2019. ***Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscription as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed***.

140.     The Offering Documents inaccurately described as potential certain risks associated with fluctuations in ON24's quarterly results and the performance of the business, potential declines in ON24's revenue growth rate and fewer new enrollments or renewals as the impact of COVID-19

lessens, and ON24's ability to retain and expand customer usage, and to attract new customers. The

Offering Documents stated, in pertinent part:

> ***Our quarterly results may fluctuate significantly and
> may not fully reflect the underlying performance of our business***.
>
> Our quarterly results of operations and financial condition may vary significantly in the future, and period-to-period comparisons may not be meaningful. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Our quarterly results of operations and financial condition may fluctuate as a result of a variety of factors, many of which are outside of our control and may not fully reflect the underlying performance of our business. ***For example, our revenue and revenue growth rate may decline in future periods compared to 2020 as the impact of COVID-19 lessens***. Further, because we generally invoice our customers at the beginning of the contractual terms of their subscriptions to our solutions, our financial condition reflects deferred revenue that we recognize ratably as revenue over the contractual term. ***If fewer new enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates may decrease***. Fluctuation in quarterly results may negatively impact the value of our securities. ***Factors that may cause fluctuations in our quarterly results of operations include:***
>
> - ***our ability to retain and expand customer usage;*** **[and]**
>
> - ***our ability to attract new customers.***

141.   The Offering Documents inaccurately described as potential certain risks: ON24's

ability to attract new customers or retain, expand the usage of, or upsell products to existing

customers; whether customers will renew, increase their usage of, or purchase subscriptions for

additional solutions; whether subscription renewals will decline or fluctuate; and whether ON24 will

expand the usage of solutions amongst existing customers. The Offering Documents stated, in

pertinent part:

> ***Failure to attract new customers or retain, expand the usage of, and upsell our
> products to existing customers would harm our business and growth prospects***.
>
> We derive, and expect to continue to derive, a significant portion of our revenue and cash flows from sales of subscriptions to our products. As such, our business depends upon our ability to attract new customers and to maintain and expand our relationships with our existing customers, including by expanding their usage and upselling

additional solutions.  Our business is largely subscription- based, and customers are not obligated to and may not renew their subscriptions after their existing subscriptions expire.  *As a result, customers may not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, if they renew at all.  Renewals of subscriptions may decline or fluctuate because of several factors, such as dissatisfaction with our solutions or support, a customer no longer having a need for our solutions or the perception that competitive products provide better or less expensive options*.  In order to grow our business, we must continually add new customers and replace customers who choose not to continue to  use our platform.  Any decrease in user satisfaction with our solutions or support may result in negative online customer  reviews and decreased word-of-mouth referrals, which would harm our brand and our ability to grow.

*In addition to striving to attract new customers to our platform, we seek to expand the usage of our solutions by our existing customers by increasing the number of departments, divisions and teams that use our solutions within each of our customers.  If we fail to expand the usage of our solutions by existing  customers or if customers fail to purchase other solutions from us, our business, financial condition and results of operations would be harmed.*

142.    The Offering Documents inaccurately described as potential certain risks: COVID-19's impact on ON24's results of operations; the economic impact of COVID-19 on customer and prospective customer spending; customers' ability or willingness to purchase or renew subscriptions; whether ON24's results of operations reflect the effect of COVID-19; and COVID-19's effects on customer demand.  The Offering Documents stated, in pertinent part:

*Our results of operations may be adversely impacted by the COVID-19 pandemic.*

*[T]he economic impacts of COVID-19 have affected and may continue to affect customer and prospective customer spending on technology such as ours, particularly for businesses involving in-person interactions, such as hospitality, manufacturing and professional services businesses.   These customers may experience reduced revenue and revised budgets, which may adversely affect our customers' ability or willingness to purchase subscriptions to our platform, the timing of subscriptions, customer retention, and the value or duration of subscriptions, all of which could adversely affect our operating results.*

*            *            *

*Due to our subscription-based business model, the effect of the COVID-19 pandemic may not be fully reflected in our results of operations until future periods*.  In addition, uncertainty regarding the impact of COVID-19 on our future operating results and financial condition may result in our taking cost-cutting measures,

reducing the level of our capital investments and delaying or canceling the implementation of strategic initiatives, any of which may negatively impact our business and reputation.  ***The global macroeconomic effects of the COVID-19 pandemic and related impacts on our customers' business operations and their demand for our solutions may persist for an indefinite period, even after the COVID-19 pandemic has subsided***.

143.    The statements referenced above in ¶¶ 137-42 were each inaccurate statements of material fact when made because while noting only the potential negative impacts on ON24's business, financial condition, and results of operations, the Offering Documents failed to disclose the significant, then-existing material events, trends, and uncertainties that ON24 had already been facing at the time of the IPO, as listed in ¶ 129.

**THE INDIVIDUAL DEFENDANTS CONTINUED TO CAUSE THE COMPANY TO MAKE FALSE AND MISLEADING STATEMENTS FOLLOWING THE IPO**

144.    On March 30, 2021, the Company filed its Annual Report for the fiscal year concluded on December 31, 2020 (the "2020 10-K").  The 2020 10-K contained many of the same false and misleading statements and omissions contained in the Offering Documents.  Specifically, the 2020 10-K contained the false and misleading statements and omissions contained in ¶¶ 126-28, 130-34, 136, and 137-42 above.

145.    Likewise, on May 13, 2021, the Company filed its Form 10-Q for the period ended March 31, 2021 (the "2021-1Q").  The 2021-10Q also contained many of the same false and misleading statements and omissions contained in the Offering Documents and the 2020 10-K.  Specifically, the 2021-10Q contained the false and misleading statements and omissions contained in ¶¶ 126, 128, 134, 136, and 139-143 above.

146.    The statements and omissions contained in the 2020 10-K and 2021-1Q were each materially false and misleading statements and omissions of material fact when made because they failed to disclose and misrepresented the significant, then-existing material events, trends, and uncertainties that ON24 had already been facing at the time of their filing with the SEC, as listed in ¶ 129.

1  **THE TRUTH IS REVEALED**

2  147.   After the market closed on August 10, 2021, ON24 announced its financial results for

3  Q2 2021.  In its Q2 2021 earnings release, ON24 provided its financial outlook for the third quarter

4  ended September 30, 2021 ("Q3 2021").  Specifically, ON24 reported that it expected total revenue

5  of $47.5 to $48.5 million — ***$3.2 million less*** at the midpoint versus analysts' consensus of $51.2

6  million total revenue.  ON24 also reported that it expected a non-GAAP operating loss of $(4.0) to

7  $(3.0) million and a non-GAAP net loss per share of $(0.09) to $(0.07) — ***$0.9 million and $0.03 per***

8  ***share worse*** at the midpoints versus analysts' consensus of $(2.60) million operating loss and $(0.05)

9  net loss per share, respectively.

10  148.   In the same Q2 2021 earnings release, ON24 also provided its financial outlook for

11  the full year ended December 31, 2021 ("FY 2021").  Specifically, ON24 reported that it expected

12  total revenue of $201.2 to $204.2 million—***$6.3 million less*** at the midpoints versus ON24's prior

13  guidance of $207.5 to $210.5 million total revenue, and ***$6.4 million less*** at the midpoint versus

14  analysts' consensus of $209.1 million total revenue.  ON24 also reported that it expected a non-GAAP

15  operating loss of $(4.3) to $(1.3) million and a non-GAAP loss per share of $(0.13) to $(0.06)—***$2.3***

16  ***million and $0.05 per share worse*** at the midpoints versus ON24's prior guidance of $(2.0) to $(1.0)

17  million operating loss and $(0.08) to $(0.02) loss per share, and ***$2.6 million and $0.10 per share***

18  ***worse*** at the midpoints versus analysts' consensus of $(0.2) million operating loss and $0.0 loss per

19  share.

20  149.   During the related Q2 2021 earnings call held on August 10, 2021, Defendant Sharan

21  claimed that ON24 "experienced higher-than-expected ***churn and downsell from customers we***

22  ***signed up in the second quarter of last year*** during the peak of COVID.  This ***higher churn was***

23  ***primarily in the first-time renewal cohort***, customers who signed up 1-year contracts last year and

24  who were up for renewal."  Defendant Sharan added that "the total Q3 and Q4 renewal cohorts are

25  meaningfully smaller than Q2.  Most importantly, when we look at Q2, the ***lower churn was primarily***

26  ***in the SMB***."

27  150.   During the same Q2 2021 earnings call, Defendant Vattuone explained:

28

> [T]he *share of first-time renewals in Q2 '21 was outsized accounting for over 60% of the cohort.  We saw high churn and downsell within the first-time renewals cohort, which primarily included a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events* who rush to find alternative solutions to in-person business, but are normally not our primary target audience.

Defendant Vattuone added that, "in the second quarter of 2020, a larger-than-typical percentage of customers added were SMB customers, and these customers accounted for approximately 50% of our logo churn."

151.    In response to a question about churn from an analyst at Robert W. Baird & Co. Incorporated ("Baird"), Defendant Vattuone answered, "Now the primary factor for this was our first year renewals, which Sharat [Sharan] mentioned, being over 60% of the renewal mix in Q2.  And we did see higher churn and downsell than we were initially expecting."

152.    The same analyst at Baird followed up with another question about churn, to which Defendant Sharan responded, "One of the things we learned, now that we know the data points and why these people churn, if they don't integrate our platform in this onetime use case, that's not the customer I want."

153.    In response to another question about churn from an analyst at KeyBanc Capital Markets Inc., Defendant Sharan answered,

> First of all, I explained our ideal customer buyer profile, and I think it's important to keep in mind that we focus on solving the sales, marketing and partner engagement platform, right?  People who -- customers who integrate our products in their sales and marketing ecosystem.  Now we have the churn that we saw was downsell, that we would win back.  And we also talked about the SMB customers being -- and the onetime buyers were the large part of the churn.  So let me talk about the SMB and onetime buyers.  As these folks saw in Q2 that life may return to some form of normalcy, they're focused on going back to physical events and then also probably thought about going back to cheaper point solutions, cheaper virtual event platforms, okay?  In some cases, what I would call ankle buyers, okay?  And there's also probably a small portion of people who -- our sales and marketing customers but don't care about data and integration.  They may have looked at cheaper video conference tools.

154.    Market analysts quickly noted both the weakened third quarter 2021 and full year 2021 outlook and the unexpected churn issues.  On August 11, 2021, for example, analysts at J.P.

Morgan Securities LLC ("JPMorgan") downgraded ON24's common stock from "overweight" to "neutral" and lowered their price target from $85 per share to $32 per share in a report titled "2Q21: Downgrading to Neutral as Post-Pandemic Churn/Down-Sell Is Bigger than Anticipated."  The report explains that the "**major issue is the increase in churn and enterprise down-sell that will likely cause platform revenue to decelerate into the first quarter of 2022**."  The report stresses:

> **Management's previous guidance had not factored in enough in churn from smaller accounts** that had driven up professional services revenue, and that causes a double hit to both platform and professional service revenue line items.  Separately, a shift back to hybrid and in-person events is seeing some portion of enterprise accounts reducing spend on items like number of licenses and workspaces, and that further impacts platform revenue.

155.    The August 11, 2021 JPMorgan report further explains:

> ON24 experienced **higher than expected churn and down-sell in the June quarter, primarily in the first-time renewal cohort that represented ~60% of the entire renewal base. Less sticky SMB customers accounted for roughly 50% of this churn**, as many of these businesses rushed to adopt digital solutions at the onset of the pandemic but now are either adopting smaller-scale solutions or returning to in-person events.

156.    The report also notes: "FY21 revenue guidance is coming down by ~$6M at the midpoint as a result of these dynamics, in addition to the fact that professional services revenue should decline to 13-14% of total revenue for the full-year, down from its COVID high of ~22% in FY20."

157.    On August 11, 2021, analysts at Canaccord Genuity LLC ("Canaccord") downgraded ON24's common stock from "buy" to "hold" and lowered their price target from $45 per share to $30 per share in a report titled "COVID renewals take a bite out of growth; **ONTF in the penalty box**, downgrade to HOLD."  The report explains:

> Q2 was a transition quarter as vaccinations became widespread and a significant number of transitory customers who had joined ON24's platform out of necessity during the pandemic chose not to renew.  **Elevated churn came primarily from first-time renewals who had signed up for one-year deals at the height of COVID, and in particular from SMB buyers** within that cohort who had rushed to find alternatives to in-person business for one-time events – 50% of logo churn came from those SMBs.  **To be clear, these are not normally ON24's target customer**, with its platform being far better suited to enterprises, and priced as such.

158.     The August 11, 2021 Canaccord report further explains:

ON24 added 183 new logos during the quarter, which was offset by 167 customer departures, equating to 8% logo churn in a single quarter.  For the sake of comparison, ON24 added 266 net new customers in the year ago quarter – *we believe this indicates that around half of renewals in that COVID cohort chose not to renew, if not more. This was ON24's largest renewal cohort ever, with the share of first-time renewals accounting for over 60% of the batch* – the remaining 40% of the cohort saw retention dynamics equivalent to pre-pandemic levels.

159.     The report also notes: "Management lowered its guidance for the year, citing two factors:  (1) most obviously, churn and downsell in Q2 was more than anticipated, and those trends are flowing through to future periods; and (2) management expects professional services revenue to decline in conjunction with lower implementation- and one-time event-related fees."

160.     On August 11, 2021, analysts at Piper Sandler & Co. ("Piper Sandler") also lowered their price target from $70 per share to $40 per share in a report titled "Largest Renewal Quarter Bites Hard as Customers Downsize; Lowering PT to $40."  The report explains that "[m]ixed Q2 results and revised 2H guidance of 5% y/y (vs. 12% prior estimate) *was clearly more negative than we had anticipated*.  Q2 was the largest renewal quarter, and *it bit hard as enterprise customers downsized contract values* and was *further exacerbated by higher SMB churn*."

161.     The August 11, 2021 Piper Sandler report further explains:

*ARR stalled at $164.1M, pressured by renewal downsizing and churn*…. ARR increased just $1M sequentially to $164.1M with strong new customer additions partially offsetting the *largest quarter of existing customer renewals that selected to downsize the number and volume of virtual events and webinars. SMB churn also contributed to the smallest number of net new customer additions of just 16 q/q in three years.*

162.     The report also notes:  "2H guidance lowered by $7M on declining professional services.  The *combination of renewal downsizing and higher SMB churn was accentuated by a material reduction in the 2H outlook for professional services*."

163.     The August 11, 2021, Piper Sandler report also stresses:  "Reducing PT to $40 on revised outlook and execution risk.  Despite *material estimate cuts, a considerable amount of near-*

*term execution risk, and a potential turnaround that might not materialize until mid- 2022*, we see limited downside risk below our bear-case of $25 (4x CY23E EV/S)."

164.    On August 11, 2021, analysts at William Blair & Company, L.L.C. analyzed ON24's weak results and financial outlook in a report titled "Rocky Second Quarter Impacted By Churn and Downsell in COVID Cohort; Revenue Guidance Lowered for the Year."  The report explains:

> At the beginning of the pandemic, many customers looked to ON24 as a quick fix to help them reach their customers in a virtual environment.  While this led to explosive growth for the company during 2020, many of them purchased ON24 for a limited use-case (e.g., hosting a small number of webinars) and did not take advantage of the data capture and analytics capabilities that are a core part of ON24's platform.  In addition, ***many of these customers were outside the customer profile the company typically targets.  Of those customers who churned, about 50% were SMB, whereas ON24 is primarily enterprise focused***.

165.    After the market closed on November 9, 2021, ON24 announced its financial results for the third quarter ended September 30, 2021, or Q3 2021.  In its Q3 2021 earnings release, ON24 provided its financial outlook for the fourth quarter ended December 31, 2021 ("Q4 2021").  Specifically, ON24 reported that it expects total revenue of $51.0 to $52.0 million"—***$0.8 million less*** at the midpoint versus analysts' consensus of $52.3 million total revenue.

166.    During the related Q3 2021 earnings call held on November 9, 2021, Defendant Sharan claimed that the "third quarter of 2021 marked our lapping the second COVID-influenced quarter.  Overall, the dollar value of churn declined quarter-over-quarter, and churn rate was in line with our expectations."  Defendant Sharan added:  "As we anticipated in Q2, the percentage of first-time renewals in the renewal cohort decreased meaningfully quarter-over-quarter, although ***we continue to face headwinds from those renewals***."

167.    During the same Q3 2021 earnings call, Defendant Vattuone explained:

> In Q3, we lapped another COVID-influenced quarter and first-time renewals from customers who purchased in the year ago period represented slightly more than half of the total renewal cohort, a meaningful decline compared to Q2.  ***We faced headwinds with respect to those first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs***.  We also saw some rationalization with midterm additions from the year ago period.  Overall, the dollar

value of churn declined compared to Q2, and the churn rate was in line with our forecast.

168.   Defendant Vattuone added:

Total customer count declined slightly quarter-over-quarter to 2,054, with **SMB churn representing the largest contributor to the decrease**.  Given the learnings from the past couple of quarters, **we are laser-focused on acquiring enterprise and mid-market customers that meet our ideal customer profile** and with whom we can develop a lasting strategic relationship.

169.   In response to a follow-up question about the "sequential" loss of new customers and "SMB churn" from an analyst at Piper Sandler, Defendant Vattuone answered:  "So in terms of Q3, given our learnings from the last couple of quarters, we are really most focused on customer quality and adding enterprise and mid-market customers that really meet our ideal customer profile.  I can tell you that **SMB was the largest contributor to the customer count decrease in Q3**."

170.   Market analysts quickly noted both the weakened Q4 2021 outlook and the continued churn issues.  On November 10, 2021, for example, analysts at JPMorgan lowered their price target from $32 per share to $22 per share in a report titled "3Q21:  Working Towards Stabilization."  The report explains:

(1) Total customer count declined by ~1% sequentially to 2,054, **largely driven by continued SMB churn**.  (2) Net new ARR of $3.1M brought September quarter total ARR to $167.2M, and this metric was negatively impacted by the fact that **slightly more than half of the total renewal cohort were first-time renewals**.  (3) Though renewal-related headwinds are beginning to abate, the percentage of first-time renewals should still represent ~30% of the total renewal cohort in the fourth quarter.

171.   On November 10, 2021, analysts at Canaccord lowered their price target from $25 per share to $19 per share in a report titled "A little bit of good, a little bit of bad, but not enough to change our view in either direction; HOLD."  The report explains:

[A]ttrition remains a challenge at the low-end of the market as ON24 works through a slew of **first-time renewals that signed on during the depths of the pandemic**.  To that point, the **firm's total customer count actually declined sequentially – a dynamic we had yet to see play out in this model** – and guidance suggests that revenue will decline year-over-year in Q4, which is heavily influenced by lower services revenue (subscription should grow about 10%).

172.   The November 10, 2021 Canaccord report further explains:

*[O]utsized logo churn continued*, bringing total customer count down by 24 sequentially to 2,054 (+7% y-o-y) – *logo churn was primarily attributed to SMB cohorts that became first-time customers during the pandemic primarily looking for one-time alternatives to in-person events*.   The number of >$100K ARR customers increased by 14 to 359 in Q3, which was also a decline in net adds to that group, although it now accounts for ~67% of total ARR.

173.   The Canaccord report also notes:

Management alluded to longer sales cycles as it focuses its GTM efforts on acquiring enterprise and mid-market customers that tend to be more strategic and complex in nature.  *In terms of first-time renewals who purchased in the COVID influenced year ago period, management noted this cohort had decreased meaningfully q-o-q and represented ~50% of total renewals this quarter*.  Further, it is expected to drop to ~30% of total renewals in Q4, and Q1/22 will mark the last COVID influenced quarter – the *expectation is these one-time COVID buyers will largely churn off or settle, and the firm will be able to move forward with churn characteristics that more closely align with pre-COVID historical norms*.

174.   On November 10, 2021, analysts at Piper Sandler also lowered their price target from $40 per share to $25 per share in a report titled "COVID Hangover Persists; Lowering 2022 ARR Estimates and Reducing PT to $25."  The report explains that "While ARR exceeded $150M+ exiting last year, *eroding customer renewals rate and contract downsizing over the last two quarters has pressured ARR growth to moderate meaningfully* to an estimated 11% y/y this year."

175.   The November 10, 2021 Piper Sandler report further explains:

Despite a slight improvement in ARR build in Q3 (+$3.1M q/q vs. $1.1M during Q2), we are *lowering 2022 revenue estimates by $11M to better reflect near-term headwinds*.  Additionally, we are lowering our PT to $25 from $40 on *increasing execution risks, lower estimates, and a lower multiple* given our updated growth outlook.

176.   The Piper Sandler report stresses:

*ON24 continued to see headwinds from first-time renewals*, but noted that both the percentage of first-time renewals in the renewal cohort and the dollar value of churn declined q/q.  Despite a $1.4M beat to the midpoint of Q3 revenue guidance, full-year 2021 revenue guidance was only raised $0.4M at the midpoint and continues to represent a *moderation to 29% y/y growth from 76% growth in 2020*.

177.   On November 10, 2021, analysts at Blair analyzed ON24's weak financial outlook in a report titled "Mixed Quarter With Solid Quarterly Results but Underwhelming Guidance."  The report explains:

> ON24 did not flow the entire revenue beat through its updated full- year revenue guide, implying *continued weakness into the fourth quarter*.  Although ON24's guidance plans are disappointing, we believe that management is taking a conservative stance to its fourth-quarter guidance, which factors in *similar churn and down- sell dynamics that the company experienced in the second and third quarter this year*.  Of note, ON24's COVID-19 renewal cohort is expected to represent just 30% of the overall renewal base in the fourth quarter (down from 50% in the third quarter and 60% in the second quarter).

178.   The Blair report stresses: "Despite the conservative guidance, we believe there may still be a few *tough quarters ahead for ON24 as it works through renewal cycles for its COVID cohort of customers* and laps difficult comps.  The 2022 guide next quarter will be critical, and we believe first-half revenue figures still pose some risk of being underwhelming."

179.   The November 10, 2021 Blair report further explains: "In the third quarter, total customers fell by 1.2% sequentially to 2,054 *as ON24 continues to see elevated churn dynamics in its SMB customer base*."

180.   After the market closed on February 28, 2022, ON24 announced its financial results for the fourth quarter and full year ended December 31, 2021, or Q4 and FY 2021.  In its Q4 2021 earnings release, ON24 provided its financial outlook for the first quarter ended March 31, 2022 ("Q1 2022").  Specifically, ON24 reported that it expects "total revenue of $47 to $48 million"—*$4.5 million less* at the midpoint versus analysts' consensus of $52 million total revenue.  ON24 also reported that it expects a non-GAAP operating loss of $(8) to $(7) million and a non-GAAP net loss per share of $(0.17) to $(0.15) — *$4.4 million and $0.10 per share worse* at the midpoints versus analysts' consensus of $(3.1) million operating loss and $(0.06) net loss per share, respectively.

181.   In the same Q4 and FY 2021 earnings release, ON24 also provided its financial outlook for the full year ended December 31, 2022 ("FY 2022").  Specifically, ON24 reported that it expects total revenue of $200 to $204 million—*$21.4 million less* at the midpoint versus analysts'

consensus of $223.4 million total revenue.  ON24 also reported that it expects a non- GAAP operating loss of $(30) to $(27) million and a non-GAAP loss per share of $(0.64) to $(0.58)—*$22.8 million and $0.50 per share less* at the midpoints versus analysts' consensus of $(5.7) million operating loss and $(0.11) loss per share.

182.    During the related Q4 and FY 2021 earnings call held on February 28, 2022, Defendant Sharan explained:  "Looking ahead, we believe that Q1 will mark the trough for 2022.  By far, our *largest challenge in 2021 was the first time renewal cohort* which is 4x the dollar value of first-time renewals in 2019 and had a churn rate that was approximately double that are [sic] first-time renewals in 2019."  Defendant Vattuone elaborated on customer churn:

> Our dollar-based net retention rate, or NRR, ended the year at 97%.  As a reminder, NRR is a lagging indicator and reflects the *impact of elevated churn that we experienced over the past few quarters with first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs* as well as some customers that rationalized their expansions.

183.    During the same Q4 and FY 2021 earnings call, Defendant Vattuone explained:  "Our *largest challenge that we experienced in 2021 was the first-time renewal cohort*, which was 4x the dollar value of first-time renewals in 2019, and *we experienced a churn rate that was approximately double that of the 2019 cohort*."

184.    Defendant Vattuone blamed ON24's weak FY 2022 outlook on customer churn:  "We expect a non-GAAP operating loss in the range of $30 million to $27 million and a non- GAAP net loss per share of $0.64 to $0.58 per share using 49 million basic and diluted shares outstanding.  As I mentioned, we faced headwinds in 2021, *primarily from the elevated churn within first-time renewal cohorts and rationalization* from large expansions during COVID."

185.    In response to a follow-up question about churn from an analyst at Blair, Defendant Vattuone answered:  "Now we've always run this company prudently, but we are making targeted investments to drive growth, but the major issue really has been churn."  Defendant Sharan added:

> Let me add, Arjun, to what Steve just said is *churn has been our biggest issue*.  If you look at 2021, I mean, we did quite well on growth ARR but the -- *we couldn't outrun the churn*.  And if you look at the numbers we talked about, the first-time

renewal cohort where we saw the maximum churn, that size was 4x what it was in Q1 in 2019 and the churn of the first hand renewal cohort was twice what it was in 2019.

186.    Market analysts quickly noted both the weak Q1 and FY 2022 outlook and the continued churn issues.  On February 28, 2022, for example, analysts at JPMorgan lowered their price target from $22 per share to $16.50 per share in a report titled "4Q21:  Almost Out of the Woods."  The JPMorgan report explains:

> The December quarter was not too bad on the surface, but the ***churn/usage still has another quarter of pandemic headwinds to get through*** before we start to see ARR improvement.  We do believe that ARR will be the leading metric to seeing overall improvement in revenue growth, but the ***one more quarter of headwinds does have us cutting our estimates again*** and that leads to the reduction in price target.

187.    The February 28, 2022 JPMorgan report further explains:

> (1) ***On24 continues to experience elevated levels of churn, specifically in the first-time renewal cohort***.  In January, a handful of customers with large expansions amid COVID-19 began to reassess their post-pandemic digital budgets and in turn showed higher than anticipated rationalization.  This combined with a three- point revenue headwind related to a reduction in professional services and overages is resulting in FY22 revenue guidance of $202M at the midpoint, which is ~$23M below our previous estimate (3) Dollar-based net retention came in at 97%, down from 149% in the year-ago period and reflecting the ***impact of elevated churn over the past few quarters***.  This was the first time that the company disclosed net retention in FY21 and the 97% level represents a steep discount to the pre-pandemic range of ~105-110%.

188.    On March 1, 2022, analysts at Piper Sandler downgraded ON24's common stock from "overweight" to "neutral" and lowered their price target from $25 per share to $17 per share in a report titled "Lowering to Neutral; Churn and Return to Travel Heighten Execution Risks."  The Piper Sandler report explains:

> Guidance reflects challenges ahead and increased investments.  ***Top and bottom-line guidance came in below Street expectations*** for multiple reasons:
>
> - ***Churn from first-time renewals: Q1 includes a large proportion of first-time renewals, many of which have already reduced spend on the platform as they 'rationalize' their pandemic expansions***.  The 2021 first-time renewal cohort was 4x the dollar value with a churn rate 2x the size of the 2019 first-

1  time renewal cohort.  An ARR growth trough and elevated churn are expected
2  in Q1.

- Increased investments:  ON24 plans to make targeted investments in customer
  success, the enterprise sales motion, the partner ecosystem, product
  innovation, and public cloud infrastructure.  As such, non-GAAP operating
  loss guidance for 2022 is ($30M)- ($27M) vs. Street expectations of ($5M).

189.    On March 1, 2022, analysts at Blair downgraded ON24's common stock from

"outperform" to "market perform" and analyzed ON24's weak results and financial outlook in a report

titled "Disappointing 2022 Outlook as Customers Rationalize Spend; Downgrading to Market

Perform."  The Blair report explains:  "[F]irst quarter and full year 2022 revenue guidance were below

expectations as the company is anticipating ***higher-than- expected downsell and spend***

***rationalization from its customers***.  This is largely due to COVID- 19 transitioning from pandemic

to endemic as businesses return to more normal operations."

190.    The March 1, 2022 Blair report further explains:

This is driving some of ON24's customers to reassess their budgets related to digital
experiences, such as webinars and virtual events.  The company noted that this is
***largely concentrated in customers that signed large expansions during COVID-19.***
***However, these customers are having a meaningful impact on the company's ability***
***to grow in 2022, as guidance calls for revenue to be flat at the high end and down***
***2% at the low end***.  Given the change in the company's growth prospects as a result
of fading pandemic effects, we believe the next few quarters will likely be tough for
ON24 as it focuses on reaccelerating the business for growth in a post-pandemic
world.

191.    The March 1, 2022 Blair report stresses:

***Downsell dynamics and churn were an ongoing challenge in 2021 as the COVID-***
***19 cohort of customers came up for renewal for the first time***.  While management
reiterated its confidence that first quarter 2022 will be the last quarter impacted by the
COVID- 19 renewal cohort, ***customer rationalization of spend creates another***
***headwind for growth in the same quarter***.  As the world moves past COVID-19,
companies across industries are beginning to revisit their digital experience budgets
to optimize their strategy.  During January 2022, management saw a handful of
customers that have previously expanded their usage as much as 3 times during
COVID-19 begin to reassess their post-COVID spend.  While some rationalization is
normal and forecast, ***this current rationalization is higher than expected*** and hits at
an earlier time than expected with bookings more heavily weighted toward the
beginning of the quarter.

192.     On March 1, 2022, analysts at Canaccord lowered their price target from $19 per share to $15 per share in a report titled "Another wave of renewal headwinds early in Q1 take a bite out of '22 growth; maintain HOLD."  The Canaccord report explains:

> The challenge, and *what drove the disappointing 2022 guide, came after the quarter as January was an unusually large enterprise customer renewal month, and ON24 saw more significant contraction than expected*.  These were customers generally renewing for the first time post-COVID, though many were multi-year customers that expanded on a co-terminus basis during the pandemic, and now they're rationalizing spend as some digital engagement is anticipated to be replaced with in-person activity.

193.     The March 1, 2022 Canaccord report further explains:

> Management was clear to point out that many of these customers are still renewing at 2x their pre-COVID run-rate, but *that's in many cases down from 3x at the peak of COVID, which is a change the team did not properly anticipate.  This headwind, along with a reduction in professional services revenue, has ON24 guiding for what is essentially a zero revenue growth year in 2022*, which is more than $20M below our prior expectation.  We expect that Q1 should mark the growth trough and that results should improve over the course of the year, but even so, we expect ON24 will be little more than a low-double digit ARR grower by the end of 2022.

194.     The March 1, 2022 Canaccord report stresses:

> While ON24 had a decent Q4 relative to expectations, its *revenue outlook came in weaker than anticipated due to significant spend rationalization from several large customers that had signed large expansion deals during COVID and were renewing for the first time since then*.  For perspective, these customers had expanded as much as 3x during COVID, and while their average spend is still materially higher than it was pre-COVID, they're now re-assessing their post-COVID digital marketing budgets.

195.     Since the start of the Relevant Period, the value of ON24 common stock shares has collapsed from the IPO price of $50.00 per share to $19.68 per share on September 27, 2021, the end of the Relevant Period.

## DAMAGES TO ON24

196.     As a result of the Individual Defendants' wrongful conduct, ON24 disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated ON24's credibility.  ON24 has

1    been, and will continue to be, severely damaged and injured by the Individual Defendants'

2    misconduct.

3        197.    Indeed, the Individual Defendants' false and misleading statements as alleged above,

4    have subjected ON24 to the Securities Class Action.

5        198.    ON24's market capitalization has also been substantially damaged, losing millions of

6    dollars in value as a result of the conduct described herein.

7        199.    Moreover, these actions have irreparably damaged ON24's corporate image and

8    goodwill.  For at least the foreseeable future, ON24 will suffer from what is known as the "liar's

9    discount," a term applied to the stocks of companies who have been implicated in illegal behavior

10   and have misled the investing public, such that ON24's ability to raise equity capital or debt on

11   favorable terms in the future is now impaired.

12                  **PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS**

13       200.    Plaintiff incorporates by reference and realleges each and every allegation set forth

14   above, as though fully set forth herein.

15       201.    Plaintiff brings this action derivatively in the right and for the benefit of the Company

16   to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

17       202.    Plaintiff is an owner of ON24 common stock and was an owner of ON24 common

18   stock at all times relevant hereto.

19       203.    Plaintiff will adequately and fairly represent the interests of the Company and its

20   stockholders in enforcing and prosecuting its rights.

21       204.    As a result of the facts set forth herein, Plaintiff has not made any demand on the

22   ON24 Board to institute this action against the Individual Defendants.  Such a demand would be a

23   futile and useless act because the Board is incapable of making an independent and disinterested

24   decision to institute and vigorously prosecute this action.

25       205.    At the time this action was commenced, the Board consisted of seven directors:

26   Defendants Sharan, Federman, Persson, Trempont, Zwarenstein (the "Director Defendants"), and

27

28

non-parties Anil Anora and Tony Zingale.  The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO DEFENDANTS SHARAN, FEDERMAN, PERSSON, TREMPONT, AND ZWARENSTEIN BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

206.    Director Defendants Sharan, Federman, Persson, Trempont, and Zwarenstein all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

207.    Moreover, the Director Defendants, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

208.    The Director Defendants are not disinterested because they each face a substantial likelihood of liability in light of their false and misleading statements as outlined above.  All of these defendants signed the false and misleading Registration Statement and 2020 10-K.

209.    The Director Defendants' conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a

substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of ON24 to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to defendants Sharan, Federman, Persson, Trempont, and Zwarenstein.

**DIRECTOR DEFENDANTS SHARAN, FEDERMAN, PERSSON, TREMPONT, AND ZWARENSTEIN LACK INDEPENDENCE**

210.    The Director Defendants are also incapable of considering a demand to commence and vigorously prosecute this action because they each face additional substantial likelihood of liability as they are named defendants in the Securities Class Action.

**DEMAND IS EXCUSED AS TO DEFENDANTS FEDERMAN, TREMPONT, AND ZWARENSTEIN BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

211.    Defendants Federman, Trempont, and Zwarenstein, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowing defendants Sharan and Vattuone to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, defendants Federman, Trempont, and Zwarenstein were obligated to review the Company's annual and quarterly reports to ensure their accuracy.  Instead, defendants Federman, Trempont, and Zwarenstein, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, demand is futile as to defendants Federman, Trempont, and Zwarenstein.

## COUNT I
### AGAINST DEFENDANTS THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTIONS 10(b) AND 21D OF THE EXCHANGE ACT FOR FEDERAL CONTRIBUTION AND INDEMNIFICATION

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    This claim is brought derivatively on behalf of the Company against the Individual Defendants for contribution and indemnification.

214.    The Individual Defendants herein have been named as defendants in the Securities Class Action, as alleged herein.

215.    The Individual Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading statements.

216.    Although Plaintiff does not adopt the allegations of wrongdoing that are alleged in the Securities Class Action as his own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefor, such damages should not be disproportionately borne by the Company, and the Individual Defendants are liable to the Company for contribution and indemnification.

217.    Accordingly, Plaintiff asserts this claim derivatively for contribution and indemnification, as provided by federal statute.

## COUNT II
### AGAINST THE INDIVIDUAL DEFENDANTS FOR
### BREACH OF FIDUCIARY DUTY

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    The Individual Defendants owed and owe ON24 fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe ON24 the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

220.    All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

221.    Each of the Individual Defendants had actual or constructive knowledge that violated their duty of good faith by knowingly causing and/or recklessly allowing the Company to make false and misleading statements and/or fail to disclose that: (a) ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020 that planned to either not renew or downsell; (b) of these new, 1-year customers that ON24 signed up during the second, third, and fourth

quarters of 2020, a larger-than-typical percentage were SMB customers and nonideal customers focused on using ON24's platform for one-time events that did not integrate ON24's platform into their sales and marketing ecosystems because they planned to either not renew or downsell; (c) prior to the IPO, ON24 relaxed the qualification criteria to sign up new customers and shifted to signing up one-time, event-only customers that saw ON24 as a COVID-19 related expense, regardless of whether the customer had an appropriate use case or would be "sticky" customers generating recurring revenue; (d) during both 2020 and 2021, customers informed ON24 employees as much as six months in advance that they were not going to renew their contracts; (e) before the COVID-19 pandemic, ON24 was already aware that there was high churn amongst SMB customers, and the pandemic amplified this high churn; (f) customer churn manifested prior to the IPO in several ways: customers only using ON24 as a COVID-19 solution and electing not to renew; customers such as event managers not renewing one-time purchases; and customers electing to downsell and remove features from their contract; (g) prior to the IPO the facts that ON24's small business customers were not renewing, were choosing to downsell, and did not have good retention rates were discussed at monthly "sales and client success" meetings, and customer churn was reflected in churn reports and email updates and recorded with Salesforce, Forrester, Gartner, and Totango; (h) customer demand declined during November and December 2020; and (i) given declining demand and the magnitude of new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020 that were either not renewing or were going to downsell, ON24 already faced material customer churn and downselling at the time of the IPO, as well as inevitable weaker revenues, operating losses, and losses per share in 2021; and (j) as a result, the Company's public statements were materially false and misleading at all relevant times.

222.    The Individual Defendants also caused or allowed ON24 to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding ON24's financial condition and future financial growth.

223.    The Individual Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

224.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, ON24 has sustained significant damages.

225.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

226.    Plaintiff, on behalf of ON24, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.    Finding the Individual Defendants liable for breaching their fiduciary duties owed to the Company;

C.    Directing the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

D.    Awarding damages to the Company for the harm the Company suffered as a result of the Individual Defendants' wrongful conduct;

E.    Awarding damages to the Company for the Individual Defendants' violations of Sections 10(b) and 21D of the Exchange Act;

F.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

G.    Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 29, 2022                    Respectfully submitted,

                                        **BRAGAR EAGEL & SQUIRE, P.C.**

1

*/s/ Melissa A. Fortunato*
Melissa A. Fortunato (SBN 319767)
Marion C. Passmore (SBN 228474)

2

580 California Street, Suite 1200
San Francisco, CA 94104

3

Telephone: (415) 568-2124
Facsimile: (212) 214-0506

4

Email: fortunato@bespc.com
        passmore@bespc.com

5

**HYNES & HERNANDEZ, LLC**

6

Michael J. Hynes
Ligaya T. Hernandez

7

101 Lindenwood Drive, Suite 225
Malvern, PA 1935

8

Telephone: (484) 875-3116
Facsimile: (914) 752-3041

9

Email: mhynes@hkh-lawfirm.com
        lhernandez@hkh-lawfirm.com

10

11

*Attorneys for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Preston Banks, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information, and belief.  I declare under penalty of perjury that the foregoing is true and correct.


Dated: _____
06/29/2022

*Preston Banks*
_____
Preston Banks